# NARRATIVE FOR TRUSTEE'S FINAL REPORT IN P & P REALTY, INC., CASE NO. 11-18133 – SEPTEMBER 12, 2013

1.      At the inception of the case, the Trustee took charge of a chaotic and highly distressed residential and commercial real estate brokerage and management business – one of the largest in the Chicago area.  As of the petition date, P & P Realty, Inc. (the "Debtor") had numerous outstanding closings (many of which had yet to be formally scheduled by the Debtor's management) and over 100 anxious agents.  Prior to the bankruptcy, the Debtor's agents, who were not themselves brokers and therefore relied on the REMAX brokerage license of the Debtor to effect real estate transactions, would normally negotiate buy/sell transactions and then close them through the Debtor.  By contract with such agents, the Debtor had agreed to pay such agents a portion of the commission generated from the closing, but the agents agreed the transaction itself and the commissions therefrom belonged to the Debtor. A key issue early in the case was whether the commissions generated from the non-completed closings were property of the Debtor's bankruptcy estate.  In order to protect the closings and ensure the commissions were actually generated, the Trustee not only had to litigate and prevail on the issue of whether the commissions belonged to the estate, but also had to maintain the attention and cooperation of the agents.

2.      The Trustee determined that the commissions were property of the estate subject to (i) the agents' unsecured claim for commissions and (ii)  the blanket lien of the Debtor's secured lender First Midwest Bank (together with the assignee of First Midwest's secured claim, Cohen Financial, the "Secured Lender") who was owed roughly $1 million.  The Trustee also determined that the agents could be retained by the estate to facilitate the closings post-petition. He thus devised an agent retention program by which the agents were retained by the estate to assist with the closings and were paid on an administrative claim basis, and thereby were guaranteed at least a portion of the commissions that would otherwise have been unsecured claims of little or no value in light of the Secured Lender's undersecured lien on the commissions.   The Secured Lender, in turn, stipulated to allow all but roughly 30% of its

September 12, 2013

cash collateral from the commissions   (roughly $382,000; the "Secured Lender Stipulated Secured Claim") to be used to fund agent distributions and estate expenses.   The Secured Lender Stipulated Secured Claim and the agent retention program were approved by orders of the court in September 2011 [Dkt. Nos. 61, 92 and 93] (collectively, the "Agent Retention Program")[1].

3.      In order to become "approved agents", agents had to provide adequate and verifiable information to the Trustee and his liquidation agent, Ken Novak & Associates, Inc. ("KNA"),  and complete an affidavit: (i) verifying that they had provided all necessary requested information to the Trustee, (ii)  representing that they did not divert any commissions or other property from the estate and agreeing to disgorge any such diverted property that may later be discovered by the Trustee or his agents,  and (iii) agreeing that the commissions and other fees arising from agents' transactions done through the Debtor were property of the estate. The preparation of the agent packets and affidavits, and verification of the requested information (including investigating any potential commissions circumvented by agents), required substantial time and effort of the Trustee, KNA and the Trustee's counsel, Fox, Swibel, Levin & Carroll, LLP ("FSLC").

4.      An approved agent (collectively, the "Approved Agents") would be entitled to receive 35% of the commissions generated from closings originated by such agent, as an administrative claim (the "Agent Dividend"), and an additional potential 15% of such commissions on a subordinated basis only to the extent funds remained after payment of (i) estate expenses and (ii) the Secured Lender Stipulated Secured Claim.   All but a few of the Debtor's agents agreed to participate in the Agent Retention Program.

5.       As an operating chapter 7 (through March 31, 2012), the case paralleled the initial and

---

[1]      The Agent Retention Program was developed in part as a result of brainstorming the Trustee engaged in with the US Trustee's Office early in the case (Dean Harvalis and Denise DeLaurent).  During the hearing on the motion to approve the Agent Retention Program, the court orally commented that the program "appears to be a good solution" to the problems posed by the case.

NARRATIVE FOR TRUSTEE'S FINAL REPORT IN P & P REALTY, INC.,   CASE NO. 11-18133 – SEPTEMBER 12, 2013
September 12, 2013

mid-stages of an operating chapter 11, with much rapid and necessary activity to put the case on the proper legal and business track.   The Trustee essentially had to conduct the Debtor's business of effecting closings (responding to numerous, daily inquiries from agents, buyers, sellers, title companies and third parties) with substantially less staff and resources than what the Debtor normally had pre-petition. The Debtor's principal, Patrick Allen, testified under oath that in the ordinary course he relied on a staff of roughly 19 people to conduct the Debtor's affairs; by contrast,  the Trustee and KNA conducted the same business for months with only 5 people (the Trustee, Ken Novak, and 3 other KNA employees).

6.     Overall, the combined efforts of the Trustee, FSLC and KNA facilitated the smooth completion of the outstanding closings that generated roughly $1.1 million in commission proceeds for the estate post-petition, roughly $57,000 of which was recovered from agents who attempted to divert commissions from the estate.   In addition,  through their joint efforts the Trustee, FSLC and KNA recovered roughly $85,000 in general receivables from agents who had owed fees to the Debtor pre-petition for use of the Debtor's offices. By March of 2013, after contentious and lengthy discovery and settlement negotiations, the Trustee had also obtained a favorable settlement for the estate with one of the Debtor's principal agents (James Kennedy;   together with his affiliates and relatives who did business with the Debtor  "Kennedy",  and such settlement the "Kennedy Settlement") that resulted in substantial commissions[2] previously claimed by such agent as its exclusive property being released to the general estate for distributions.

7.     When feasible the Trustee made distributions to the Secured Lender and the Approved Agents,  in the amounts of $191,496.98 (consisting of two separate payments in   June and October

---

[2]     The actual dollar amount of commissions retained by the estate per the settlement is not revealed here since the settlement agreement and motion related thereto were filed under seal in this case.  However, such commissions retained by the estate were substantially in excess of the costs shown in the FSLC and KNA fee applications related to the Kennedy matter.

NARRATIVE FOR TRUSTEE'S FINAL REPORT IN P & P REALTY, INC.,   CASE NO. 11-18133 – SEPTEMBER 12, 2013

September 12, 2013

2011, respectively) and $267,852 (between December 2011 and October 2012), respectively, in accordance with the 506(c) stipulation previously entered in this case. [Dkt. 93] (the "Stipulation"). Upon approval of this final report, the Trustee will make an additional distribution of $49,393 to the Secured Lender, as a priority claim ahead of the agents (per the Stipulation), which will bring total distributions to the Secured Lender and Approved Agents in the case to $508,741.

8.      This case lasted a little over 2 years. The two principal reasons the case could not be closed earlier were as follows:  First,  the Kennedy Settlement did not occur until March 2013 and such settlement was necessary to free up a substantial portion of commissions for distribution. While the Trustee, KNA and FSLC spent considerable time in 2011 and 2012 attempting to garner sufficient facts to settle the Kennedy matter (and did also engage in settlement discussions with Kennedy during that time), discovery disputes, incomplete information and lack of counsel by Kennedy for much of that time period made any settlement earlier than March 2013 (by which Kennedy had re-engaged counsel) infeasible and imprudent.  Second, discovery disputes with potential defendants whom the Trustee suspected of circumventing estate proceeds prolonged resolution of certain circumvention claims.

9.      The following factors increased the administrative expenses in this case: (i)  the structuring of the Agent Dividend as an administrative claim, which was ultimately necessary to adequately incentivize agents, protect the closings and generate commissions; (ii) the high level of difficulty experienced by the Trustee and KNA in obtaining timely and accurate information from certain agents; (iii) the extensive discovery required to investigate circumvention of monies owed the estate, and substantial time incurred in dealing with agents who chose not to be assisted by counsel in discovery matters; and (iv) the need to operate the Debtor for a substantial period of time (analogous to a chapter 11 case),  with less than the Debtor's usual levels of staff, and yet obtain the same level of results in effecting closings (all of which occurred other than those cancelled by mutual consent of buyer

September 12, 2013

and seller).

10.     The Trustee took the following steps, among others, to lower administrative costs of the estate: (i) initiate early and aggressive efforts to settle claims, including the Kennedy claim and circumvention claims, in lieu of litigation (which is typically more expensive and time-consuming); (ii) abandon certain circumvention and receivables claims that appeared uncollectible,  or as to which the potential defendant appeared to have a valid defense or whose dilatory tactics would unduly delay the administration of the case; (iii) retain contingency fee counsel to investigate certain circumvention and avoidance actions, and not pursue potential preference claims insofar as, per special counsel, such claims appeared untenable; (iv) during the period covered by the FSLC final fee application (September 23, 2011 through July 12, 2013; the "Application Period"), limit Neville Reid's hourly rate to $325 for his "attorney time" spent on the case, which was significantly less than his usual and customary hourly rate during that period, which ranged from $465 to $495; (v) write off $25,507 of FSLC actual legal time incurred on the case;  and (vi) accept KNA's discount of $27,313 of time KNA incurred on the case during the Application Period.